IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLYDE ROMBACH, III, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 2:20-cv-01348 |
| v. | ) |
| | ) |
| PLUMBERS LOCAL UNION NO. 27 | ) |
| PENSION FUND, | ) |
| | |
| Defendant. | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Plaintiff Clyde Rombach, III ("Plaintiff" or "Rombach") filed suit in this Court against Defendant Plumbers Local Union No. 27 ("Union") Pension Fund ("Fund" or "Plan"), a multi-employer pension plan maintained pursuant to collective bargaining agreements between the Plumbers Local Union No. 27 and various participating employers, one of which is W.G. Tomko, Inc., the company for which Rombach worked for over thirty (30) years. Relying on the Employee Retirement Income Security Act, 29 U.S.C. 1001, et seq. ("ERISA"), Rombach alleges that the Plan improperly suspended his early retirement pension benefits for which he was otherwise eligible from October 2016 to December 2019 contrary to the provisions of the Plan and in violation of ERISA. (ECF No. 1).

Each party has filed a Motion for Summary Judgment. (ECF Nos. 23, 26). Both Motions have been fully briefed, oral argument held before the Court, and supplemental post-argument materials filed. The matter is ripe for resolution.

For the reasons that follow, Plaintiff's Motion for Summary Judgment (ECF No. 26) is GRANTED, while Defendant's Motion for Summary Judgment (ECF No. 23) is DENIED.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Most of the historical facts involved in this case are not in dispute, and were the subject of specific Findings of Fact and Conclusions of Law by the Plan Trustees. (ECF No. 17-2) ("FF/CL"). Clyde Rombach first joined the Plumbers Local Union No. 27 as an apprentice plumber and subsequently became a Plan participant in 1976. In 1987, Rombach began working for W.G. Tomko, Inc, ("Tomko"), a contractor that performs, among other things, plumbing work here in Western Pennsylvania. Tomko was at all times relevant to these matters a signatory and contributing employer of and to the Plan.

Rombach worked for Tomko from 1987 until 2019, first as a foreman through approximately 2005-2006, and then as Project Manager from some time in the 2005–2006-time frame to 2009 following a promotion to that position. During Rombach's time as Project Manager, Tomko continued to make contributions to the Pension Fund on Rombach's behalf, contributions which the Plan accepted and for which Rombach received credit. Rombach also retained his membership in the Union until the end of 2008, when he resigned his Union membership, at the same point at which Tomko also stopped contributing to the Plan on his behalf.

The record reflects that Rombach's Union membership and contributions to the Plan on his behalf ended as of December 31, 2008. (ECF No. 17-4, Ex. D). The Trustees found that such was the last day of Rombach's covered employment under the applicable labor agreement and the Plan, a point neither party contests. (ECF No. 17-4, Ex. D). And this change in status appears from the record to coincide with Rombach's assuming the Senior Project Manager position.

As Senior Project Manager, Rombach was performing many of the same basic duties as he did when he was Project Manager, but as the Senior Project Manager he was at least one rung above the Project Managers within the Tomko organization and had the responsibility for

supervising the Project Managers. (FF/CL No. 20)); however, in neither position did he personally perform plumbing or pipefitting services, nor does it appear that he directly supervised job-site workers or field operations as to any such work. The record is also plain that at no time while Rombach was a Senior Project Manager were contributions to the Plan made on his behalf, nor was he a member of the Union, nor did the Plan or the Union take issue with those status changes.

On or around August 15, 2016, Rombach, at that time aged 60 and a Senior Project Manager, applied for early retirement benefits under the Plan based on his prior participation in the Plan, to become effective October 1, 2016. The Plan allows for an early pension provided that the participant "reached age 57 and completed ten years of service." Plan Section 4.03. The Plan acknowledged Rombach's eligibility for such a benefit, but simultaneously suspended his pension benefit based on his then-current work at Tomko in the position of Senior Project Manager.

Upon the issuance of the suspension directive, Rombach triggered the Plan's administrative appeal provision, which entitles Plan beneficiaries who have had their benefits suspended to a full hearing before the Plan's Trustees. Rombach, represented by counsel, appealed the benefits suspension on February 3, 2017. The Board of Trustees of the Pension Fund denied Rombach's appeal on June 29, 2017 and informed Rombach of the denial on July 18, 2017. Then, on January 9, 2018 and following further correspondence between counsel for Rombach and for the Plan, Rombach was granted a hearing before the Trustees, which was conducted on July 12, 2018.[1] On December 10, 2018, the Plan issued a final decision of the Trustees denying Rombach's further appeal.

On September 8, 2020, Rombach filed this civil action seeking recovery of the benefits he

---

[1] The appeal hearing generated an extensive administrative record, including a stipulation of facts entered into by Rombach and the Fund, by their respective counsel, along with a verbatim transcript. That administrative record is part of the record here. (ECF No. 17).

alleges were improperly suspended during the referenced suspension period. The last month during which Rombach's pension benefits were suspended by the Plan was December 2019, and as of that date, payment of his pension benefits had been reinstated. His pension benefit was thus suspended for the last quarter of 2016 and the full years of 2017, 2018, and 2019. Rombach seeks recovery of those suspended benefit amounts, along with any other remedies ERISA permits, such as interest, litigation costs and counsel fees.

After conducting some fact discovery in this case while it has been in this Court, both parties moved for summary judgment. (ECF Nos. 23, 26). Both parties responded to the respective opposing Motions, (ECF Nos. 29, 33), and Plaintiff filed a reply (ECF No. 35). Oral argument on the cross-motions was held. Defendant later filed a Notice of Supplemental Authority (ECF No. 39) to which Plaintiff replied (ECF No. 43). Both Motions having been fully briefed, they are ripe for disposition.

## DISCUSSION

### I.     Standard of Review

The issue before the Court is, in actuality, rather straightforward: namely, whether Rombach's work at Tomko as a Senior Project Manager and within the time window of suspension at issue was a proper basis for the suspension of his Plan retirement benefits during that window. In answering that question in the context of this action and the competing summary judgment motions, the Court must first determine the applicable standard of review.

#### A. Summary Judgment

A court may grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "There

is a genuine dispute of material fact if the evidence is sufficient for a reasonable fact finder to return a verdict for the nonmoving party." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) (citing *Anderson*, 477 U.S. at 248). However, a mere "scintilla of evidence" in the nonmovant's favor does not create a genuine issue of fact, nor does speculation or conjecture defeat a motion for summary judgment. *Ramara*, 814 F.3d at 666 (citing *Anderson*, 477 U.S. at 252; *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).

Where cross-motions for summary judgment are filed, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). The Court's job, then, is to determine whether there exists a genuine issue of material fact as to any of the arguments made in favor of summary judgment for either party.

### B. Review of the Trustees' Administrative Decision

With respect to the Court's review of the Plan's administrative decision, all parties agree that the Plan itself grants the Trustees broad discretion in the administration of the Plan, including the interpretation and application of its terms. Plan Section 10.04. Given that broad grant of discretion, the highly deferential "abuse of discretion" standard of review would apply in resolving the Motions for Summary Judgment. *Viera v. Life Ins. Co of North America*, 642 F. 3d 407, 413 (3d Cir. 2011); *Clauss v. Geisinger Health Plan*, 196 F. Supp. 3d 463, 469 (M.D. Pa. 2016). Under that standard, the only "record" properly before the Court with respect to facts, as well as the basis for the Plan's suspension decision and the affirmance of that decision following the July 2018 Trustees' hearing, would be the administrative record created as a result of that hearing. That record is on the docket. (ECF No. 17).

5

In our Circuit, application of that standard of review by this Court of the Trustees' decision in these circumstances turns on the Court assessing whether the Trustees' decision was "arbitrary and capricious" or "an abuse of discretion", with those terms being used interchangeably. *Fleisher v. Standard. Ins. Co.*, 679 F. 3d 116, 121 n.2 (3d Cir. 2012). When such a standard is applied in a case such as this, the Court does not consider matters not advanced to the Trustees. *Howley v. Mellon Fin. Corp.*, 625 F. 3d 788, 793 (3d Cir. 2010); *University Hospitals of Cleveland v. Emerson Electric Co.*, 202 F. 3d 839 (6th Cir. 2000).  And in reaching its conclusions here, the Court need not, and does not, consider the factual matters advanced by both parties outside of the administrative record before the Trustees. *Noga v. Fulton Financial Corp. Employee Benefit Plan, et al.*, 19 F. 4th 264 (3d Cir. 2021) (explaining ERISA "records rule" and general exclusion of additional evidence when the abuse of discretion standard applies).

For these purposes, the standard of review is quite deferential, but that does not mean that it is weightless. It is one that has "teeth". *Schlear v. Carpenters Pension and Annuity Fund*, 22-1843, 2023 WL 3569971, *3 (E.D. Pa. May 18, 2023). The decision of a plan administrator is considered to be arbitrary and capricious if it is without a rational connection between the known facts and the decision at issue, or between the found facts and the evidence before the decision maker. *Clauss* at 469 (quoting *Bellaire Gen'l Hosp v. Blue Cross Blue Shield*, 97 F. 3d 822, 828 (5th Cir. 1996).

Plaintiff advocates for a different standard of review than that outlined above, arguing that where the Plan or its Trustees purports to interpret or apply positive law beyond the language of the Plan, such as ERISA itself or its implementing Regulations, the standard of review becomes *de novo*, and the record may be supplemented with new facts. Rombach attempts to do at least two things as to and from the record in these regards.

6

First, he asserts that the Trustees improperly accepted as true certain statements of fact contained in a stipulation made as part of the administrative record by counsel for the parties. Rombach has advanced no reason for this Court to conclude that such stipulation entered into by Rombach while represented by counsel should not be taken at face value, either by the Trustees in their proceeding or by the Court in this action, nor why the Trustees at the appeal hearing should not have treated the matters set out in the stipulation as proven without further evidence. No matter the standard of review, that stipulation is properly in the record, and should and will be taken as conclusive on the *factual* matters set forth in it and as stated by the Court here as having been established. The Court concludes that the stipulation, and the facts contained in it were properly before the Trustees and could be considered by them.

Second, Rombach argues that because the written decision of the Trustees on the appeal to them cites to provisions of ERISA and its Regulations, (ECF No. 17-2), the standard of review for all matters in this action becomes *de novo*. But this is not so. In considering the arguments of the parties and the record before the Court, the Court concludes that, to the extent the decision at issue actually relies on an application of positive statutory or regulatory law, Rombach is correct in that a *de novo* standard of review would apply. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). But a review of the Trustees' decision, and the appeal proceedings before them, reveals that the Trustees' decision was based on their interpretation of the Plan itself, and to the extent that references were made to ERISA or relevant federal Regulations, such were to buttress or reinforce those conclusions and not as an independent evaluation of federal law, such that the abuse of discretion standard is not displaced. *See Penn v. Howe Baker Engineers,* 898 F. 2d 1096, 1101 (11th Cir. 1990).

The Court will therefore apply the abuse of discretion standard in reviewing the Plan's

7

decision interpreting the terms of its own Plan. In light of this approach, the Court does not believe that factual supplementation of the record as offered up by the parties is either appropriate or necessary.

II.  **Even applying the "abuse of discretion" standard, Rombach is entitled to summary judgment in his favor.**

As noted above, both parties were represented by counsel in the appeal proceedings before the Trustees of the Plan. Among other things, counsel stipulated to certain facts. Concisely, the question before the Court, on the basis of those stipulated facts and those found by the Trustees, is whether the Plan's determination that Rombach's work for Tomko as a Senior Project Manager during the time window at issue was work that triggered suspension of his benefits under the Plan was proper, or more accurately, whether its decision that such work did trigger the suspension was an "abuse of discretion".

In answering that question, the key issues before the Plan were (1) whether Rombach was generally entitled to begin receiving an "early pension" under the Plan's provisions (answered "yes"); (2) whether Rombach was working more than 40 hours a month (answered "yes"); (3) whether that work was in the same geographic region as the work covered by the various union-represented employees covered by the Plan (answered "yes"); (4) whether Tomko was performing work in an industry that included plumbing and pipefitting work (answered "yes"); (5) whether that industry was one "in which any employees covered by the Plan were employed" when Rombach's early pension was to begin being paid (answered "yes");  (6) whether Rombach was employed by Tomko as a "Senior Project Manager" during the time window at issue (answered "yes"); and (7) whether Rombach as a Senior Project Manager was employed in a "trade or craft utilized in the industry". Pursuant to the stipulation of facts agreed to by both parties, none of the issues at (1) through (6) are in dispute, and the answer to each such question was properly found

to be "yes".

The only remaining issue, then, was as to question (7), namely, whether Rombach, as a Senior Project Manager at Tomko, was employed during the suspension time window at issue "[i]n a trade or craft utilized in the industry" such that he would be ineligible to collect pension benefits under the Plan while so employed, *e.g.* that his benefits were properly suspended. Plan Section 12.03. Upon Rombach's administrative appeal, the Trustees determined that he was so ineligibly employed, and that suspension of his pension benefits was proper under the Plan and was also consistent with the benefit suspension provisions of ERISA.

The record demonstrates that the Trustees had before them a number of facts that they could consider in determining whether Rombach was ineligible for the payment of pension benefits during the specified time window. More importantly for the purposes of the Court's review here, however, is that there were a number of stipulated facts in the administrative record and available to the Trustees that were necessarily material and found by the Trustees in their Findings, but that they failed without explanation to explain whether or how they were considered in making their determination. It is on the basis of that failure that the Court concludes the Trustees' decision was arbitrary, and therefore an abuse of discretion.

The central question before the Trustees was whether, while working as a "Senior Project Manager", Rombach was to have his benefits suspended because he was employed in a "trade or craft utilized in the industry." In evaluating that question, the Trustees made a number of findings.

First, the Trustees found that many of the daily tasks of the work of the "Senior Project Manager" were, for all intents and purposes, essentially the same as that of a "Project Manager", with perhaps a few modest upgrades, and that there was not a separate written job description for the "Senior" level role, but only one for that of the "Project Manager". These findings are

9

sufficiently supported by the administrative record. At the same time, however, the Trustees also found that the Senior Project Manager was responsible for supervising the Project Managers at Tomko, plainly placing it at least one step above the Project Manager position. Importantly, the Trustees did not address the latter found fact in reaching their conclusion that benefit suspension was required by the Plan's terms. (FF/CL No. 36).

Second, the Trustees found, and it is without dispute, that while Rombach was working as a "Project Manager", retirement contributions were made on his behalf to the Plan, and he retained his Local 27 membership. (FF/CL No. 18). The reasons for this are left unexplained in the administrative record and in the Trustees' ultimate decision; in fact, at oral argument before this Court, neither party could explain whether or why that position was considered covered under the Plan's provisions or the underlying labor contract. At the same time, however, nothing in the record reflects that Rombach or the Plan disclaimed those contributions, that Tomko sought to get its contributions back, or that the Plan thought it necessary to return those contributions on the basis that they were improperly remitted for hours worked in a non-covered job classification.

Third, the Trustees specifically found that the Project Manager was "covered" by the Plan, but that the Senior Project Manager's position was not a Union-covered position, nor was it covered by the Plan. (FF/CL No. 19).

Thus, from the Court's perspective, by their conduct, all of the parties here appeared to treat the Project Manager position as one properly covered by the Union labor agreement and the Plan, necessitating Rombach's Union membership and contributions to the Plan on his behalf based on work in the Project Manager position. But it is in the failure to offer any explanation as to why the Senior Project Manager position was nevertheless an ineligible job for the purposes of Rombach's Union membership and contributions to his pension by the Plan that the Plan's

reasoning went awry.

To the extent that Rombach had Plan contributions made on his behalf while a "Project Manager" carries any meaning, the reality that the change in his job title resulted in those contributions *stopping* must logically also carry meaning. The same goes for his change in Union membership status. For reasons not explained at all by the Trustees, when Rombach moved to the Senior Project Manager's position, those two very material attributes of Rombach's employment with Tomko changed—he was no longer a member of the Union, nor were contributions to the Plan being made on his behalf. And that those changes were proper is demonstrated by the absence in the record of any protest by the Plan or the Union of those two significant changes. Considering *all* of the Trustees' Findings together—that the daily tasks of the two positions were essentially the same, that Rombach did receive contributions while employed as a Project Manager, that those contributions were proper under the Plan, that the Senior Project Manager position supervised the Project Managers and was neither a "Union" position nor was it covered by the Plan—coupled with their failure to consider necessary and material facts, the ultimate decision rendered by the Trustees was inherently arbitrary.

The Trustees' decision to deem Rombach ineligible for the then-current payment of retirement benefits in the Senior Project Manager's position, both initially and upon appeal, was devoid of consideration of those material status changes. And a Trustee's decision regarding a Plan member's eligibility for pension contributions that fails to consider or address material facts in the administrative record and actually found by the trustees is inherently arbitrary. Here is why.

While Rombach was classified as a "Project Manager," he had contributions to the Plan made on his behalf and for at least part of that time remained a member of Local 27. In the Court's judgment, it is inherent in the Trustees' decision that such was both proper and indicative of

Rombach working in a covered "craft or trade in the industry" while he was a Project Manager. After all, while in that position, Rombach was a Union member, and contributions to the Plan, one covering "Union" work, were made on his behalf. And as noted above, the Trustees found that such was a "Union" position.

But if the Trustees gave weight (as the Court concludes they necessarily did) to Rombach's Local 27 membership and the contributions to the Plan on Rombach's behalf as indicating his being employed in a covered "trade or craft", those factors evaporated when Rombach was elevated to the new role of Senior Project Manager and was no longer a member of the Union and no longer received contributions towards his pension, changes that went without protest from the Union or the Plan (or its Trustees). So, by those significant changes in Rombach's status *vis a vis* the Union and the Plan, in addition to the heightened leadership duties that Rombach took on as a Senior Prokect Manager, all parties involved here necessarily recognized that his status relative to the Plan and the Union, as well as his work duties, had materially changed when he was promoted to the Senior Project Manager's position. Otherwise, the Trustees would have been (properly) seeking back contributions as to Rombach's service while he was Senior Project Manager or otherwise calling into question why Rombach was doing the "same job" as that of a Project Manager but without Plan contributions on his behalf.

But there is no record that such occurred, or that the Plan or its Trustees considered Rombach's lack of Union membership, the absence of contributions to the Plan on his behalf, or the fact that as a Senior Project Manager Rombach took on supervisory duties when they elected to equate the Project Manager and Senior Project Manager positions for all relevant purposes. In fact, the record reflects that the Trustees gave no weight in reaching their conclusions to their own factual finding that the Senior Project Manager position supervised the Project Managers at

12

Tomko. And while there was plainly some overlap of daily duties between the prior "Project Manager" position and the "Senior Project Manager" position, that change generated a new title for Rombach, along with responsibility for supervising the Project Managers, and it plainly had important new consequences—the stoppage of Plan contributions and the cessation of Union membership. Those new consequences and responsibilities, which were set out in the administrative record, are nowhere addressed in the Trustees' ultimate conclusion at FF/CL 36.

These factors distinguish the situation in this case from that in *Helgemo v. Operating Engineers Local 324 Pension Fund*, No. 21-2951, 2022 WL 670139 (6th Cir. March 7, 2022) relied upon by the Defendant, a case in which there was "plenty of overlap" between pre- and post-retirement positions, making the plan trustees upholding a suspension of benefits not an abuse of discretion. *Id.* at *4. Here, there was a fundamental change in the relationship between the involved positions and Rombach's formal relationship with both the Union and the Plan, a change not reflected or addressed in the Trustees' decision. (ECF No. 17-2).

In the Court's judgment, the Trustees' conclusory equation of the Project Manager and Senior Project Manager positions for purposes of the Plan's pension benefit suspension provision without considering and then addressing the change in the relationship between Rombach, the Union, and the Plan when he went from being a Project Manager to being a Senior Project Manager was arbitrary and unreasonable.

In equating the two positions, the Trustees failed to explain or even address the material and relevant differences between them for the purposes of Rombach's eligibility for Plan membership. That such changes occurred is not in dispute and such was in the factual record before and found by the Trustees, but it nevertheless appears that the Trustees simply concluded that the two jobs, Project Manager and Senior Project Manager, were one and the same. (FF/CL No. 36).

13

Specifically, the Trustees found (1) that the Senior Project Manager supervised the Project Managers at Tomko, (2) that that role had at least some greater responsibilities than those of the Project Managers, (3) that the Project Manager position was "covered" by the Plan, and (4) that the Senior Project Manager position was not covered by the Union or the Plan. (FF/CL Nos. 17-20). Yet, notwithstanding those specific Findings, and without explanation, they went on to conclude that the two positions were "identical" in responsibilities without further explanation, and therefore Rombach's status as Senior Project Manager mandated the suspension of the Plan benefits for which he was otherwise eligible. (FF/CL No. 36).

In short, by concluding that the Senior Project Manager position was "work in the trade or craft utilized in the industry" simply because the Project Manager position was such a position, which is the inescapable import of their decision, the Trustees failed to consider that Rombach's position change was fundamental enough that he was at least one level above the Project Manager position in Tomko's operations, and that Union membership and Plan contributions had ceased without protest or objection, and that the Senior Project Manager position carried with it those enhanced supervisory responsibilities.

Instead of addressing the actual differences between the Project Manager and Senior Project Manager positions that Rombach held, or explaining why one position merited Rombach's membership the Union and participation in the Plan while the other necessitated his suspension from benefits under the Plan (and yet considering the two positions the "same"), the Trustees' decision was seemingly focused on the undisputed reality that Tomko was a business in the construction industry and one that performed plumbing and pipe fitting work. Tomko unquestionably does work "in the industry". But that conclusion failed to address the key question of whether Rombach *himself* was employed in a "trade or craft utilized in the industry" while a

14

Senior Project Manager. The Trustees' focus on the work of Tomko's business was at best a materially incomplete analysis and at worst one that was fundamentally incorrect.

Boiled to their essentials, the benefits suspension provisions of the Plan focus on whether or not a retiree has come back to work in a job that is covered by the Plan, with the principle being that if the employee has done so, pension benefits should not flow during that renewed term of employment in a covered "trade or craft"; an employee does not get to go back to the type and kind of job from which they retired and nonetheless keep receiving early pension benefits along with their wages during that return engagement. *See Eisenrich v. Minneapolis Retail Meat Cutters and Food Handlers Pens. Plan*, 574 F. 3d 644, 644-50 (8th Cir. 2009) (involving benefits suspension provisions aimed at preventing "double dipping" during retirement from a covered position while also collecting wages from reemployment in covered employment). So it was important in considering the core issue here that the Trustees address whether the Senior Project Manager position was actually "in a trade or craft utilized in the industry". Simply equating the Project Manager's position with that of the Senior Project Manager based on little more than the verbiage of a written job description, without taking into account that all parties involved considered the first position a "Union" position accompanied by Plan contributions and yet did not consider the second position (one with enhanced management duties) to be so qualifying, stopped far short of the full analysis required of the Trustees.

In addition, that an employer generally engages in covered work, that is, that it employs people performing work "in a trade or craft utilized in the industry" may be relevant to the determination of the central question here, but such does not make all jobs at that employer necessarily included within work "in a trade or craft utilized in the industry". The approach that the Trustees took of focusing on the work that Tomko as a business conducted, coupled with their

15

comparison of the written descriptions for the Project Manager and Senior Project Manager jobs, stopped far too short, as the actual question before them was whether *the employee*—here, Rombach—was so employed.

Under the broader theory that the Plan Trustees employed here, every position at Tomko, bottom to top, would be an "occupation" that included work "in the craft or trade involved" that triggers a suspension of benefits.As this Court posited at oral argument in this case, the Trustees' broad interpretation of the Plan, focusing on what "Tomko the business" did as a whole, would lead to the result that an employee moving into a top executive position from a Plan-covered position would also be considered to be employed in a "trade or craft in the industry". Under any standard of review, that unreasonably gives too broad of a reading to the suspension language within the Plan's provisions. In adopting such theory in Rombach's case, the Trustees acted unreasonably, erroneously and arbitrarily.

## CONCLUSION

Applying the relevant "abuse of discretion" standard of review, the Court concludes that the bases for the Plan's conclusion that Rombach's work as a Senior Project Manager had him employed "in a trade or craft utilized in the industry" was unreasonable, arbitrary, and an abuse of discretion. The Trustees' analysis that, because there was a substantial overlap between the stated duties of the Project Manager and the Senior Project Manager positions and because Tomko itself was more broadly involved in the relevant industry, Rombach's new position required the suspension of Plan contributions, was materially incomplete, failing to fully take into account the work and responsibilities that Rombach was responsible for in the Senior Project Manager position and the material status changes that occurred when Rombach became a Senior Project Manager.

Rombach's pension benefit suspension was therefore arbitrary and capricious, unreasonable and an abuse of discretion. Given the record before the Trustees and now the Court, the conclusion that Rombach was, while a Senior Project Manager, employed in a "trade or craft utilized in the industry" was without factual support when the record is considered as a whole, and for the Trustees to conclude otherwise was demonstrably an erroneous abuse of discretion and arbitrary.

The Plaintiff's Motion for Summary Judgment will be granted, and that of the Defendant denied. The Plan shall take all steps necessary to reverse the financial and any other impact on Rombach of the suspension during the time window at issue, including payment over of the suspended early pension benefits, prejudgment interest, and post-judgment interest commencing on the date of this Order, each at the statutorily applicable rate.

For the reasons set out above, Plaintiff's Motion for Summary Judgment (ECF No. 26) is GRANTED. Defendant's Motion for Summary Judgment (ECF No. 23) is DENIED. Should counsel for Plaintiff seek the award of attorney's fees and awardable litigation costs, such petition shall be submitted to the Court within 21 days of the date of this Opinion.

An appropriate Order will issue.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: July 26, 2024